Original proceeding in mandamus, filed March 10, considered and under advisement March 30; petition for a writ of mandamus allowed, peremptory writ to issue April 9, 2021

STATE ex rel Representative Tina KOTEK
and Senator Peter Courtney,
on behalf of the Oregon Legislative Assembly,
*Plaintiffs-Relators,*

*v.*

Shemia FAGAN,
Oregon Secretary of State,
*Defendant.*

(S068364)

484 P3d 1058

Relators, appearing on behalf of the Oregon Legislative Assembly (Legislative Assembly), filed an original mandamus proceeding, explaining that, due to the COVID-19 pandemic, the federal government will not meet its statutory deadline to produce federal decennial census data in time for either the Legislative Assembly or the Secretary of State (Secretary) to meet the deadlines for decennial reapportionment of state legislative districts set out in Article IV, section 6, of the Oregon Constitution. Relators asked the court to issue a writ of mandamus requiring the Secretary to fulfill her constitutionally specified duties and to do so on dates ordered by the court, and the Secretary opposed the petition. *Held*: (1) The voters' paramount purposes behind Article IV, section 6, were to (a) ensure that reapportionment occur in conjunction with each federal census and reflect the data provided by that census; (b) permit the Legislative Assembly to prepare and enact a reapportionment plan, but, if it did not, to provide as an alternative that the Secretary would make a reapportionment plan; and (c) provide for electors to challenge the reapportionment plan in the Supreme Court; (2) the court is authorized to issue a writ of mandamus to order the fulfillment of those constitutional duties; (3) it is not possible for the state to fulfill its duty to create a reapportionment plan based on federal census data and still comply with the constitutionally prescribed deadlines; and (4) alternative deadlines will enable the Legislative Assembly and the Secretary to fulfill their constitutional duties without significantly affecting the rights of voters or interfering with the 2022 general election cycle.

The petition for a writ of mandamus is allowed. Peremptory writ to issue. Notwithstanding ORAP 9.25(1), the State Court Administrator shall issue the peremptory writ and appellate judgment on Monday, April 19, 2021, unless a petition for reconsideration is electronically filed by 11:59:59 p.m. on Friday, April 16. Notwithstanding ORAP 9.25(2), if a petition for reconsideration is filed, a response to the petition may be electronically filed by 11:59:59 p.m. on Wednesday, April 21. A timely petition for reconsideration shall stay issuance of the appellate judgment until the court acts on the petition.

En Banc

Anna M. Joyce, Markowitz Herbold PC, Portland, filed the petition for writ of mandamus and reply in support of petition for plaintiffs-relators. Also on the petition were Harry B. Wilson and Stephen F. Deatherage.

P.K. Runkles-Pearson, Assistant Attorney General, Salem, filed the memorandum in opposition and reply for defendant. Also on the memorandum were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

WALTERS, C.J.

The petition for a writ of mandamus is allowed. Peremptory writ to issue. Notwithstanding ORAP 9.25(1), the State Court Administrator shall issue the peremptory writ and appellate judgment on Monday, April 19, 2021, unless a petition for reconsideration is electronically filed by 11:59:59 p.m. on Friday, April 16. Notwithstanding ORAP 9.25(2), if a petition for reconsideration is filed, a response to the petition may be electronically filed by 11:59:59 p.m. on Wednesday, April 21. A timely petition for reconsideration shall stay issuance of the appellate judgment until the court acts on the petition.

**WALTERS, C. J.**

The relators in this mandamus proceeding are Representative Tina Kotek, Speaker of the Oregon House of Representatives, and Senator Peter Courtney, President of the Oregon State Senate. Appearing on behalf of the Oregon Legislative Assembly (Legislative Assembly), they inform us that the federal government will not meet its statutory deadline to produce federal decennial census data and, therefore, that neither the Legislative Assembly nor the Secretary of State (Secretary) will be able to meet the deadlines for decennial reapportionment of state legislative districts set out in Article IV, section 6, of the Oregon Constitution.[1] Relators ask that we exercise our authority under Article VII (Amended), section 2, of the Oregon Constitution[2] and issue a writ of mandamus requiring the Secretary to fulfill her constitutionally specified duties and to do so on dates ordered by the court. Relators served their petition for writ of mandamus on the Secretary, and she has appeared in opposition.

As we will explain, Article IV, section 6, requires the Legislative Assembly or the Secretary to reapportion legislative districts every 10 years on the basis of federal decennial census data, and includes deadlines to ensure that a final reapportionment plan is adopted in time for the next general election cycle. In this case, because the federal government's delayed release of the 2020 census data makes it impossible for the Legislative Assembly and the Secretary to fulfill their constitutional responsibilities without an adjustment of those deadlines, and because the deadlines can be modified without significantly affecting the duties of the Legislative Assembly or the Secretary, or the rights of electors, and without interfering with the general election cycle, we will exercise our authority to compel compliance with Article IV, section 6, according to a revised schedule set

---

[1] The full text of Article IV, section 6, is set out in Appendix 1 to this opinion.

The deadlines for reapportioning the state into federal congressional districts differ and are governed by statute. *See* ORS 188.125 (setting out different deadlines and other procedural requirements).

[2] Article VII (Amended), section 2, provides, in part, that "the supreme court may, in its own discretion, take original jurisdiction in mandamus, *quo warranto* and habeas corpus proceedings."

out in Appendix 2 to this opinion. We will issue a peremptory writ directing the Secretary to abide by that schedule.

The reapportionment process is set out in Article IV, section 6, of the Oregon Constitution. In summary, that section directs the Oregon Legislative Assembly to reapportion state legislative districts in the year next following the federal decennial census. Or Const, Art IV, § 6(1).[3] If the Legislative Assembly fails to enact a reapportionment plan, then Article IV, section 6, requires the Secretary to make a plan. *Id*. § 6(3). In either instance, electors are permitted to challenge the plan, and this court is granted original jurisdiction and directed to review any such challenges. *See id*. §§ 6(2), 6(3)(b)‑(e).

Article IV, section 6, also sets out deadlines for each of those actions. Relevant here, the Legislative Assembly is to enact a reapportionment plan by July 1 of the year following the federal decennial census. *Id*. §§ 6(1), 6(3). If the Legislative Assembly fails to enact a plan by July 1, then the Secretary is required to make a reapportionment plan by August 15. *Id*. § 6(3)(a). In ordinary circumstances, those deadlines would give the Legislative Assembly three months after receipt of the federal census data to enact a plan and, if it failed to do so, then the deadlines would give the Secretary an additional 45 days to make her plan. That is because, by federal law, the United States Secretary of Commerce must conduct the decennial census in 1980 and every 10 years thereafter and provide results to the states before April 1 of the following year. 13 USC § 141(a), (c). Thus, in ordinary circumstances, the State of Oregon would receive federal census data by March 31, 2021, allowing three months for the Legislative Assembly to enact a plan by its deadline of

---

[3] Article IV, section 6(1), specifies that reapportionment shall occur in "the odd-numbered year regular session of the Legislative Assembly next following an enumeration of the inhabitants by the United States Government." It is not disputed that that phrase refers to the "[e]numeration" of inhabitants by the federal government that is mandated every 10 years by Article I, section 2, of the United States Constitution. The federal government conducts that "enumeration" every 10 years pursuant to the Census Act, 13 USC, § 1 *et seq*. The parties understand Article IV, section 6(1), to require reapportionment in the year next following the federal census conducted under that Act (here, in 2021 following the 2020 federal census), and, for purposes of this case, we accept that understanding.

July 1, or, failing that, for the Secretary to make a plan by her deadline of August 15.

This year, however, is different. Because of the COVID-19 pandemic, the Census Bureau has announced that it will not provide 2020 census data to the states until between August 15 and August 31, 2021.[4] Consequently, assuming that the federal census data is released at the earliest anticipated date—August 15—it will come after the constitutional due dates for the plans either enacted or made by the Legislative Assembly or the Secretary.

Citing that impossibility, relators ask this court to issue a writ of mandamus. They ask us to extend the deadlines for the Legislative Assembly to enact a reapportionment plan, and to enjoin the Secretary from making a plan until after the Legislative Assembly has had an opportunity to do so.

The Secretary recognizes the difficulty identified by relators, but she objects to relators' proposed solution. She contends that this court does not have authority to issue a writ of mandamus and argues that, even if it does, no extension of the Article IV, section 6, deadlines is warranted. The Secretary concedes that federal census data "may be the most accurate and well-accepted evidence of population," but she maintains that that data is not necessary to prepare a plan. She asserts that the Population Research Center, housed at Portland State University, could provide data sufficiently reliable to adopt an initial plan and that any subsequent changes required in light of federal census data could be handled during any ensuing judicial review of an objection to the plan filed in this court.

The first question for us, then, is whether we have authority to provide relief in mandamus. As noted, Article VII (Amended), section 2, of the Oregon Constitution gives this court original jurisdiction to issue writs of mandamus. ORS 34.110 defines a writ of mandamus:

---

[4] *See* "U.S. Census Bureau Statement on Release of Legacy Format Summary Redistricting Data File" (Mar 15, 2021), https://www.census.gov/newsroom/press-releases/2021/statement-legacy-format-redistricting.html (accessed Apr 7, 2021) (data will be released "by mid-to-late August 2021").

> "A writ of mandamus may be issued to any inferior court, corporation, board, officer or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust or station[.]"

Accordingly, we have authority to issue a writ to compel the performance of an act that the law requires the Legislative Assembly or the Secretary to perform, given their respective duties regarding reapportionment. In this case, relators assert that we have authority to order the Legislative Assembly and the Secretary to wait to perform their reapportionment duties until after the federal census data is received, and to order revised deadlines to enable them to accomplish those duties. The Secretary responds that we do not have that authority. In her view, we would not be ordering her to do what the law requires, but, instead, would be commanding what the law prohibits. We agree with the parties that whether this court can order an extension of the deadlines in Article IV, section 6, depends on the nature of the reapportionment duties of the Legislative Assembly and the Secretary. To inform our understanding of that issue, we begin by looking both to the federal constitutional requirements for reapportionment, and to the genesis of Article IV, section 6.

The Equal Protection Clause of the United States Constitution imposes a duty on the states to reapportion state legislative districts by population. *See Reynolds v. Sims*, 377 US 533, 568, 84 S Ct 1362, 12 L Ed 2d 506 (1964) (Equal Protection Clause "requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis").[5] Although reapportionment every

---

[5] In *Reynolds*, the United States Supreme Court expressed the compelling nature of that command:

"To the extent that a citizen's right to vote is debased, he is that much less a citizen. The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote. The complexions of societies and civilizations change, often with amazing rapidity. A nation once primarily rural in character becomes predominantly urban. Representation schemes once fair and equitable become archaic and outdated. But the basic principle of representative government remains, and must remain, unchanged—the weight of a citizen's vote cannot be made to depend on where he lives. Population is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies. A citizen, a qualified voter, is no more nor no less so

10 years is not constitutionally mandated, any longer interval "would assuredly be constitutionally suspect." *Id*. at 583-84.

The original Oregon Constitution also contemplated regular reapportionment of state legislative districts by population. Article IV, section 5, provided for a state census every 10 years starting in 1865, and Article IV, section 6, required the Legislative Assembly to conduct a reapportionment in the year after every census, state or federal. *See* Or Const, Art IV, §§ 5, 6 (1857). However, despite the duty to do so, the Legislative Assembly made no changes to legislative district boundaries for a period of more than four decades, between 1911 and 1952. *See* Official Voters' Pamphlet, General Election, Nov 4, 1952, 81 (explanatory statement noting that last reapportionment had been in 1911).[6]

In 1952, the voters amended Article IV, section 6, to require reapportionment after only the federal, as opposed to the state, census and to require the Secretary to make a reapportionment plan if the Legislative Assembly failed to

---

because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause. This is an essential part of the concept of a government of laws and not men. This is at the heart of Lincoln's vision of 'government of the people, by the people, [and] for the people.' The Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races.

"*****

"We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis."

377 US at 567-68 (alteration in original; footnotes omitted).

[6] The explanatory statement for the 1952 amendment to Article IV, section 6, which established the framework used today for reapportionment, provided, in part:

"At the present time and because the Legislature has failed to make any reapportionment for over 40 years, some Counties or Districts have more legislative representation than they are entitled to under the present Constitution. Others have less representation. This amendment would bring about an immediate reapportionment on the population basis now provided by the Constitution and would assure that such a reapportionment would hereafter be made every ten years."

Voters' Pamphlet at 81. Indeed, the ballot title caption for the proposed measure was "Constitutional Legislative Senator and Representative Apportionment Enforcement Amendment." *Id*.

do so.[7] Given the history just discussed, the voters' purpose in amending the provision at issue before us seems to have been two-fold: (1) to ensure that reapportionment occur in conjunction with each federal census and reflect the data provided by that census; and (2) to permit the Legislative Assembly to enact a reapportionment plan, but to provide an alternative if it did not.

Thus, Article IV, section 6, imposes a duty on the Legislative Assembly to enact a reapportionment plan based on federal census data in advance of the next general election cycle, and it imposes a similar duty on the Secretary if the Legislative Assembly fails to act. We are authorized to issue a writ of mandamus to order the fulfillment of those constitutional duties, and, as we will explain, we do not see the deadlines prescribed by that section as prohibiting us from exercising that authority.

As indicated, the voters' intent was to require that reapportionment occur every 10 years based on census data and in time for the upcoming election cycle. Notably, neither the text of Article IV, section 6, nor the history of the amendments to that section, indicates that the voters intended the specified deadlines to serve a purpose other than to provide a means to those ends. We have been presented with no reason why the voters who adopted the 1952 amendments would have been concerned with the exact date by which the Legislative Assembly or Secretary are required to enact or make a plan, except as part of a larger framework calculated to result in the adoption of a timely final plan. Nor is there any indication that the voters would have intended to require the Legislative Assembly to adhere to the July 1 deadline for legislative action in the unforeseen event that federal census data—the impetus for drawing new

---

[7] Although Article IV, section 6, was revised in 1986 (House Joint Resolution (HJR) 6 (1985), adopted Nov 4, 1986), and the text has undergone minor additional modifications since, the current version retains all the salient features first adopted in 1952. The 1986 revision expressly was not intended to change the overall scheme established in 1952; rather, it merely extended the deadlines and made certain other changes not relevant to the question before us. *See* Official Voters' Pamphlet, General Election, Nov 4, 1986, 8 (explanatory statement). Accordingly, we focus on the voters' purpose in 1952.

In 1972, the voters deleted Article IV, section 5, providing for a state census. HJR 16 (1971), adopted May 23, 1972.

district lines in the first place—was not available by that date.

Instead, the voters' paramount interests seem to have been to direct the Legislative Assembly to enact a reapportionment plan based on census data in advance of the next general election cycle and to provide an alternative means by which a plan would still be made if the Legislative Assembly fails to act. As we see it, the fact that the voters also adopted deadlines to give effect to those interests does not deprive us of authority to order that the Legislative Assembly and the Secretary fulfill the primary duties that the voters imposed. If it were possible for the State of Oregon to comply with all the requirements of Article IV, section 6, we of course would require that it do so. But here, where it is not possible for the state to create a reapportionment plan based on federal census data and still comply with the constitutionally prescribed deadlines, and where it is possible for the state to fulfill its paramount duties in compliance with modified deadlines, we conclude that we have authority to direct it to do so. Relators ask us to use our mandamus authority to require the Secretary to act in accordance with the duties imposed by Article IV, section 6—to make a reapportionment plan based on data from the federal census, and to wait to do so until the Legislative Assembly has first had an opportunity to enact a plan. We conclude that we have authority to make such orders, and we now turn to the question of whether we should do so.

The Secretary argues that we need not act because the Legislative Assembly can use available noncensus data that is sufficiently accurate to enable it to enact an initial reapportionment plan by the July 1 deadline, which could then be revised during the judicial review process. We see substantial flaws in the Secretary's argument.

For one, the Secretary concedes that census data is the best evidence of population, and she does not dispute the central role that Article IV, section 6, accords to federal census data in plan preparation. If it is possible to wait for that data and meet other constitutional requirements, then requiring the enactment or making of a plan without that

data seems to fly in the face of the provisions of Article IV, section 6.[8]

A second flaw in the Secretary's argument is that requiring a two-step process—the enactment or making of a plan using noncensus data, with later revisions to align with census data—would interfere with the electors' constitutional right to object to a plan prepared by the Legislative Assembly. Article IV, section 6, gives electors 30 days after a reapportionment plan is enacted or made to file objections to the plan. *See* Or Const, Art IV, §§ 6(2)(a), 6(3)(b) (last date for objection by electors is August 1 or September 15, depending on which entity enacted or made plan).[9] The Secretary does not dispute that the constitutional revision process contemplates that electors will have time to evaluate the plan in light of census data and make individually targeted objections. *See* Or Const, Art IV, §§ 6(2)(c), 6(3)(d) (both providing that, if plan enacted or made "does not comply with subsection (1) [of Article IV, section 6,] * * * and all law applicable thereto," this court must specify "with particularity wherein the reapportionment fails to comply"). Thus, as the Secretary also recognizes, if a plan were enacted or made without federal census data, electors would be required to file "placeholder" objections for later revision once the census data becomes available. Beyond that, this court would be required to engage in a wide-ranging and potentially unconstrained review of a challenged plan in an effort to identify problems, all with little or no input or assistance from interested parties.[10] Such a result is not

---

[8]   In so noting, we do not suggest that the Legislative Assembly or the Secretary must rely only on census data in all instances. *See Hartung v. Bradbury*, 332 Or 570, 599 n 26, 33 P3d 972 (2001) (permitting Secretary to use noncensus data to correct plan when census data regarding particular census block was indisputably in error and reliable, unbiased sources were available). It may be useful for the Legislative Assembly or the Secretary to prepare draft reapportionment plans using noncensus data from the Population Research Center before enacting or making a plan. Given the short time frames involved, we do not wish to discourage or prohibit that use.

[9]   Not only might the objections have to be made without access to the census data, but persons responding to the objection might have to do so without reference to the data, either. *See* ORAP 11.35(6)(a) (briefs in opposition are due 10 business days after date objections are due).

[10]   *See* Or Const, Art IV, §§ 6(2)(b), 6(3)(c) (Supreme Court's jurisdiction is to determine whether challenged plan "complies with subsection (1) of this section and all law applicable thereto"); *id*. §§ 6(2)(c), 6(3)(d) (if plan does not comply,

consistent with the constitutional expectation that electors should have adequate time to make objections and to have those objections heard.

Finally, the Secretary's argument assumes that, after a reapportionment plan is enacted or made without the benefit of federal census data, this court will conduct a review process, during which federal census data can be considered. However, no such review process will occur if electors do not file objections to such a plan. We reject the Secretary's argument that we should not act because there is no need to act.

Our final challenge is to determine whether we can craft deadlines that will enable the Legislative Assembly and the Secretary to fulfill their constitutional duties without significantly affecting the rights of voters or interfering with the 2022 general election cycle.[11] The Secretary has represented that candidates for state legislative office must declare their candidacy by March 8, 2022. *See* ORS 249.037(1) (declaration of candidacy must be filed at least 70 days before nominating election). For potential candidates to be able to do so, they must have some reasonable certainty that they have resided in that legislative district for the required period of time. *See* Or Const, Art IV, § 8(1)(a)(B) (general requirement is one year before election date); *id*. § 8(1)(b) (for general election in year following reapportionment, candidate must have resided in district since January 1). Accordingly, a reapportionment plan must become final before March 8, or it would derail the primary election scheduled to be held on May 17, 2022. In addition, any revised deadlines must still allow sufficient time for participation and review by those with a role in the process, including electors and, assuming one or more objections are filed, review by this court.

---

Supreme Court must issue opinion that specifies "with particularity wherein the reapportionment fails to comply").

[11] In an effort to identify possible alternative deadlines that would achieve the requirements of Article IV, section 6, we previously submitted a draft set of deadlines to the parties. We have considered the parties' responses, as well as the federal government's recently revised announcement that census data will be available earlier than previously expected. As discussed below, the dates set out in Appendix 2 of this opinion reflect those considerations.

Attached as Appendix 2 to this opinion are a revised set of deadlines and a revised set of effective dates that will meet those objectives. The deadlines set out in Appendix 2 provide participants with substantially the same amount of time as they would have had under the deadlines set out in Article IV, section 6, and a plan will be final no later than February 8, 2022.[12] The Legislative Assembly and the Secretary will have less time to work with the census data than would be true in an ordinary year, but the Secretary has assured us that both will have the use of noncensus population data that should enable their work to begin well before the census data is delivered.

In light of the impossibility of compliance with the constitutionally prescribed dates that is presented by the delay in delivery of the federal census data, we conclude that a writ of mandamus should issue directing the Secretary to fulfill her constitutional responsibilities in compliance with the deadlines set out in Appendix 2 to this opinion.

Certain other changes are also necessary. First, the census delays leave no doubt that the Legislative Assembly cannot enact a reapportionment plan during its regular session. *See* Or Const, Art IV, § 6(3) (Legislative Assembly must enact plan during regular sessions and no later than July 1). This year's regular session must end by June 28, 2021, and the census data will not be received by that date. *See* Or Const, Art IV, § 10(1)(a) (regular session of legislature cannot last longer than 160 days; current regular session began on January 19). To give the Legislative Assembly its constitutionally guaranteed opportunity to enact a reapportionment plan, relators ask this court to authorize the Legislative Assembly to enact such a plan during an emergency session, rather than a regular session. We agree that

---

[12] Article IV, section 6(6), provides two different effective dates. The only effective date affected by this decision is set out in section 6(6)(b), which applies "[f]or purposes of electing Senators and Representatives to the next term of office that commences after the applicable deadline for making a final reapportionment under this section." The other effective date provision, set out in section 6(6)(a), applies in all other instances, and for those purposes, the reapportionment plan is not effective until January 2023. *See* Or Const, Art IV, § 6(6)(a) (plan is "operative on the second Monday in January of the next odd-numbered year after the applicable deadline for making a final reapportionment under this section").

that is appropriate, and we will include that provision in the writ that is to issue.

Second, relators have asked us to revise the deadline in Article IV, section 8(1)(b). That section provides that, for the general election after a reapportionment, legislative candidates must become a resident of the districts they seek to represent by the assumed effective date of the reapportionment: January 1, 2022. Given the potential delay in the effective date of the reapportionment, we modify that deadline so that the residency period runs from the date that the reapportionment becomes effective under the revised deadlines set out in Appendix 2 of this opinion.[13]

Ordinarily, at this stage of a mandamus proceeding, we would allow the petition and issue an alternative writ of mandamus. Doing so would trigger further pleading, briefing, and oral argument before this court. *See* ORAP 11.15 (describing process). In this case, however, time is of the essence, and the parties agree that the filings already before us fully and adequately set out their positions; no additional briefing is needed. Accordingly, we treat the matter as fully submitted and ready for decision.

For the reasons discussed above, relators' petition for a writ of mandamus is allowed. A peremptory writ of mandamus shall issue establishing revised deadlines for performance of the paramount duties described in Article IV, section 6; permitting the Legislative Assembly to enact a reapportionment plan during an emergency session; providing a revised residency timeline under Article IV, section 8(1)(b); and directing the Secretary to perform her duties under Article IV, section 6, pursuant to the revised deadlines set out in Appendix 2.

---

[13] Relators have identified a number of additional statutory deadlines that they suggest needed to be changed. None of those deadlines runs from the effective date of the reapportionment; almost all the deadlines are the first date that some action is permitted, and almost all those first dates precede the currently prescribed January 1 effective date for a reapportionment. The reason why persons should be prohibited from taking action earlier is neither obvious nor explained by relators. Moreover, doing so would in most cases narrow the available window of time for taking such actions. Accordingly, we decline the invitation to make those additional changes.

The petition for a writ of mandamus is allowed. Peremptory writ to issue. Notwithstanding ORAP 9.25(1), the State Court Administrator shall issue the peremptory writ and appellate judgment on Monday, April 19, 2021, unless a petition for reconsideration is electronically filed by 11:59:59 p.m. on Friday, April 16. Notwithstanding ORAP 9.25(2), if a petition for reconsideration is filed, a response to the petition may be electronically filed by 11:59:59 p.m. on Wednesday, April 21. A timely petition for reconsideration shall stay issuance of the appellate judgment until the court acts on the petition.

APPENDIX 1—TEXT OF ARTICLE IV, SECTION 6

"(1)   At the odd-numbered year regular session of the Legislative Assembly next following an enumeration of the inhabitants by the United States Government, the number of Senators and Representatives shall be fixed by law and apportioned among legislative districts according to population. A senatorial district shall consist of two representative districts. Any Senator whose term continues through the next odd-numbered year regular legislative session after the operative date of the reapportionment shall be specifically assigned to a senatorial district. The ratio of Senators and Representatives, respectively, to population shall be determined by dividing the total population of the state by the number of Senators and by the number of Representatives. A reapportionment by the Legislative Assembly becomes operative as described in subsection (6) of this section.

"(2)   This subsection governs judicial review and correction of a reapportionment enacted by the Legislative Assembly.

"(a)   Original jurisdiction is vested in the Supreme Court, upon the petition of any elector of the state filed with the Supreme Court on or before August 1 of the year in which the Legislative Assembly enacts a reapportionment, to review any reapportionment so enacted.

"(b)   If the Supreme Court determines that the reapportionment thus reviewed complies with subsection (1) of this section and all law applicable thereto, it shall dismiss the petition by written opinion on or before September 1 of the same year and the reapportionment becomes operative as described in subsection (6) of this section.

"(c)   If the Supreme Court determines that the reapportionment does not comply with subsection (1) of this section and all law applicable thereto, the reapportionment shall be void. In its written opinion, the Supreme Court shall specify with particularity wherein the reapportionment fails to comply. The opinion shall further direct the Secretary of State to draft a reapportionment of the Senators and Representatives in accordance with the provisions of subsection (1) of this section and all law applicable thereto. The Supreme Court shall file its order with the Secretary of State on or before September 15. The Secretary of State shall conduct a hearing on the reapportionment at which

the public may submit evidence, views and argument. The Secretary of State shall cause a transcription of the hearing to be prepared which, with the evidence, shall become part of the record. The Secretary of State shall file the corrected reapportionment with the Supreme Court on or before November 1 of the same year.

"(d)   On or before November 15, the Supreme Court shall review the corrected reapportionment to assure its compliance with subsection (1) of this section and all law applicable thereto and may further correct the reapportionment if the court considers correction to be necessary.

"(e)   The corrected reapportionment becomes operative as described in subsection (6) of this section.

"(3)   This subsection governs enactment, judicial review and correction of a reapportionment if the Legislative Assembly fails to enact any reapportionment by July 1 of the year of the odd-numbered year regular session of the Legislative Assembly next following an enumeration of the inhabitants by the United States Government.

"(a)   The Secretary of State shall make a reapportionment of the Senators and Representatives in accordance with the provisions of subsection (1) of this section and all law applicable thereto. The Secretary of State shall conduct a hearing on the reapportionment at which the public may submit evidence, views and argument. The Secretary of State shall cause a transcription of the hearing to be prepared which, with the evidence, shall become part of the record. The reapportionment so made shall be filed with the Supreme Court by August 15 of the same year. The reapportionment becomes operative as described in subsection (6) of this section.

"(b)   Original jurisdiction is vested in the Supreme Court upon the petition of any elector of the state filed with the Supreme Court on or before September 15 of the same year to review any reapportionment and the record made by the Secretary of State.

"(c)   If the Supreme Court determines that the reapportionment thus reviewed complies with subsection (1) of this section and all law applicable thereto, it shall dismiss the petition by written opinion on or before October 15 of the same year and the reapportionment becomes operative as described in subsection (6) of this section.

"(d)   If the Supreme Court determines that the reapportionment does not comply with subsection (1) of this section and all law applicable thereto, the reapportionment shall be void. The Supreme Court shall return the reapportionment by November 1 to the Secretary of State accompanied by a written opinion specifying with particularity wherein the reapportionment fails to comply. The opinion shall further direct the Secretary of State to correct the reapportionment in those particulars, and in no others, and file the corrected reapportionment with the Supreme Court on or before December 1 of the same year.

"(e)   On or before December 15, the Supreme Court shall review the corrected reapportionment to assure its compliance with subsection (1) of this section and all law applicable thereto and may further correct the reapportionment if the court considers correction to be necessary.

"(f)   The   reapportionment   becomes   operative   as described in subsection (6) of this section.

"(4)   Any reapportionment that becomes operative as provided in this section is a law of the state except for purposes of initiative and referendum.

"(5)   Notwithstanding section 18, Article II of this Constitution, after the convening of the next odd-numbered year regular legislative session following the reapportionment, a Senator whose term continues through that legislative session is subject to recall by the electors of the district to which the Senator is assigned and not by the electors of the district existing before the latest reapportionment. The number of signatures required on the recall petition is 15 percent of the total votes cast for all candidates for Governor at the most recent election at which a candidate for Governor was elected to a full term in the two representative districts comprising the senatorial district to which the Senator was assigned.

"(6)(a)   Except as provided in paragraph (b) of this subsection, a reapportionment made under this section becomes operative on the second Monday in January of the next odd-numbered year after the applicable deadline for making a final reapportionment under this section.

"(b)   For purposes of electing Senators and Representatives to the next term of office that commences after the applicable deadline for making a final reapportionment

under this section, a reapportionment made under this section becomes operative on January 1 of the calendar year next following the applicable deadline for making a final reapportionment under this section."

## APPENDIX 2

The Oregon Supreme Court directs that the following revised deadlines be used in the State of Oregon reapportionment process for 2021:

## REAPPORTIONMENT PLAN
## BY LEGISLATIVE ASSEMBLY

1. If the Legislative Assembly enacts a plan, the following revised deadlines apply:

   a. The Legislative Assembly will enact a plan on or before Monday, September 27, 2021, and may do so in an emergency session rather than its regular session.

   b. Objections by electors are due by Monday, October 25, 2021.

      i. Responses by the Legislative Assembly, Secretary of State, or others, as well as amicus briefs (discouraged) are due by Monday, November 8, 2021.

      ii. Any reply briefs, though discouraged, are due by Monday, November 15, 2021.

   c. If the Supreme Court determines that the initial plan complies with applicable law:

      i. A Supreme Court opinion approving the plan will be filed by Monday, November 22, 2021; and

      ii. The reapportionment plan will become effective January 1, 2022, for purposes of Or Const, Art IV, § 6(6)(b), only.

   d. If the Supreme Court determines that the initial plan requires corrections, a Supreme Court opinion to that effect will be filed by Monday, December 6, 2021, and the plan will be sent to the Secretary of State for changes.

      i. The revisions by the Secretary of State are due by Monday, January 17, 2022.

      ii. The Supreme Court will approve the revisions or make any necessary additional corrections by Monday, January 31, 2022.

iii. The reapportionment plan will become effective Tuesday, February 1, 2022, for purposes of Or Const, Art IV, § 6(6)(b), only, and that will serve as the date for state legislators to establish residency under Or Const, Art IV, § 8(1)(b).

## REAPPORTIONMENT PLAN
### BY SECRETARY OF STATE

2. If the Legislative Assembly does not enact a plan by September 27, 2021, the following revised deadlines apply:

   a. If the Legislative Assembly fails to enact a plan by September 27, 2021, the Secretary of State's plan is due by Monday, October 18, 2021.

   b. Objections by electors are due by Monday, November 15, 2021.

      i. Responses by the Legislative Assembly, Secretary of State, or others, as well as amicus briefs (discouraged) are due by Monday, November 29, 2021.

      ii. Any reply briefs, though discouraged, are due by Monday, December 6, 2021.

   c. If the Supreme Court determines that the initial plan complies with applicable law:

      i. A Supreme Court opinion approving the plan will be filed by Monday, December 13, 2021.

      ii. The reapportionment plan will become effective January 1, 2022, for purposes of Or Const, Art IV, § 6(6)(b), only.

   d. If the Supreme Court determines that the initial plan requires corrections, a Supreme Court opinion to that effect will be filed by Monday, December 27, 2021, and the plan will be returned to the Secretary of State for changes.

      i. The revisions by the Secretary of State are due by Monday, January 24, 2022.

      ii. The Supreme Court will approve the revisions or make any necessary additional corrections by Monday, February 7, 2022.

      iii.  The reapportionment plan will become effective Tuesday, February 8, 2022, for purposes of Or Const, Art IV, § 6(6)(b), only, and that will serve as the date for state legislators to establish residency under Or Const, Art IV, § 8(1)(b).[14]

---

[14] Unless otherwise expressly noted or necessarily changed by implication, all other formal requisites of the reapportionment process remain unchanged.