Considered and under advisement November 17, petitions dismissed
November 22, 2021

Patrick SHEEHAN
and Samantha Hazel,
Oregon electors,
*Petitioners,*

*v.*

OREGON LEGISLATIVE ASSEMBLY,
*Respondent.*

(S068991 (Control))

David CALDERWOOD,
an individual Oregon elector, and
Gordon Culbertson,
an individual Oregon elector,
*Petitioners,*

*v.*

OREGON LEGISLATIVE ASSEMBLY,
*Respondent.*

(S068989)

499 P3d 1267

After the Oregon Legislative Assembly enacted Senate Bill (SB) 882 (Sp Sess 2021), reapportioning Oregon's legislative districts based on the federal decennial census data that was released by the United States Census Bureau in August 2021, two sets of petitioners sought review of the reapportionment, as provided in Article IV, section 6(2)(a), of the Oregon Constitution. Petitioners in *Sheehan v. Legislative Assembly* challenged the Legislative Assembly's reapportionment as a whole, arguing that it does not comply with applicable statutory standards—specifically, the requirement in ORS 188.010(2) that no district shall be drawn for the purpose of favoring a political party or an incumbent, as well as the public hearing requirements in ORS 188.016. They asked that a specified reapportionment map that had been submitted by a member of the public during the Legislative Assembly's reapportionment deliberations be adopted in the place of the Legislative Assembly's reapportionment. Petitioners in *Calderwood v. Legislative Assembly* challenged only the portions of the Legislative Assembly's reapportionment that define House Districts 8 and 12. They argued that those districts were drawn without consideration of the reapportionment criteria set out in ORS 188.010(1), in violation of that provision, and for the purpose of favoring an incumbent, in violation of ORS 188.010(2). *Held*: The *Sheehan* petitioners have not demonstrated that SB 882 in its entirety violates applicable law in any of the ways they have asserted; the *Calderwood* petitioners have not demonstrated that the parts of SB 882 defining House Districts 8 and 12 violate applicable law in any of the ways they have asserted.

The petitions are dismissed.

On petitions for review of the decision to adopt Oregon Laws 2021, chapter 2 (Senate Bill 882 (Spec Sess 2021)) as the new Oregon state legislative district reapportionment, filed October 25, 2021.*

Kevin L. Mannix, Kevin L Mannix, P.C., Salem, filed the brief for petitioners Patrick Sheehan and Samantha Hazel.

Shawn M. Lindsay, Harris Berne Christensen LLP, Portland, filed the briefs for petitioners David Calderwood and Gordon Culbertson. Also on the briefs was Misha Tseytlin, Troutman Pepper Hamilton Sanders LLP, Chicago, Illinois.

Erin K. Galli, Assistant Attorney General, Salem, filed the brief for respondent Oregon Legislative Assembly in S068991. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Peenesh Shah, Assistant Attorney General, Salem, filed the brief for respondent Oregon Legislative Assembly in S068989. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Balmer, Nakamoto, Flynn, Duncan, Nelson, and Garrett, Justices.**

GARRETT, J.

The petitions are dismissed.

_____

* Adopted at 2021 Legislative Special Session, September 27, 2021.

** Walters, C. J., did not participate in the consideration or decision of this case.

## GARRETT, J.

On September 27, 2021, in accordance with the timeline that this court ordered in *State ex rel Kotek v. Fagan*, 367 Or 803, 821, 484 P3d 1058 (2021), the Oregon Legislative Assembly enacted, and the Governor signed, a reapportionment of Oregon's legislative districts, based on the federal decennial census data that was released by the United States Census Bureau in August 2021. Senate Bill (SB) 882 (Spec Sess 2021), *codified as* Or Laws 2021, ch 2. Two sets of petitioners, all of whom are electors of this state, now seek review of that reapportionment, as provided in Article IV, section 6(2)(a), of the Oregon Constitution.[1] Petitioners in *Sheehan v. Legislative Assembly* (S068991) challenge SB 882 in its entirety on the ground that it is the product of an improper and partisan process, and they have presented a different reapportionment plan that they ask this court to direct the Secretary of State to adopt in place of SB 882. Petitioners in *Calderwood v. Legislative Assembly* (S068989) have brought a narrower challenge and ask this court to void only the sections of SB 882 that apportion House Districts 8 and 12, arguing that the Legislative Assembly drew those districts for an unlawful partisan purpose and without considering the redistricting criteria set out in ORS 188.010(1). For the reasons explained below, we dismiss both petitions.

## I.   APPLICABLE LAW

Before turning to the two petitions, we summarize the legal requirements for a reapportionment plan and the standards that apply when this court reviews such a plan.

Article IV, section 6, of the Oregon Constitution provides for regular reapportionments of the state's legislative districts based on the results of the federal government's

---

[1] Article IV, section 6(2)(a), of the Oregon Constitution provides:

"Original jurisdiction is vested in the Supreme Court, upon the petition of any elector of the state filed with the Supreme Court on or before August 1 of the year in which the Legislative Assembly enacts a reapportionment, to review any reapportionment so enacted."

Under the revised timeline ordered in *Kotek*, 367 Or at 821, petitions for review of the reapportionment enacted by the legislature were required to be filed by October 25, 2021, rather than the August 1 date specified in section 6(2)(a).

decennial census. Subsection 6(1) identifies reapportionment as, at least initially, a legislative function and sets out certain basic criteria:

> "At the odd-numbered year regular session of the Legislative Assembly next following an enumeration of the inhabitants by the United States Government, the number of Senators and Representatives shall be fixed by law and apportioned among legislative districts according to population. A senatorial district shall consist of two representative districts. \*\*\* The ratio of Senators and Representatives, respectively, to population shall be determined by dividing the total population of the state by the number of Senators and by the number of Representatives."

Or Const, Art IV, § 6(1). Subsection 6(2) provides for judicial review of a reapportionment enacted by the Legislative Assembly. It vests this court with original jurisdiction to review any reapportionment so enacted upon a petition timely filed by "any elector of the state." Or Const, Art IV, § 6(2)(a). It further provides that the object of such a review is to determine whether the reapportionment "complies with subsection (1) of this section[, *i.e.*, Article IV, section 6(1),] and all law applicable thereto." Or Const, Art IV, § 6(2)(b). And it states that, if the reapportionment is determined not to comply, the court will issue a written opinion that "specif[ies] with particularity wherein the reapportionment fails to comply" and direct[s] the Secretary of State to draft a reapportionment \*\*\* in accordance with the provisions of subsection (1) of this section and all law applicable thereto." Or Const, Art IV, § 6(2)(c).

The legislature has also enacted statutes pertinent to reapportionment of both legislative and congressional districts. ORS 188.010 sets out criteria that the legislature (or Secretary of State, if applicable) "shall consider":

> "(1)   Each district, as nearly as practicable, shall:
>
> "(a)   Be contiguous;
>
> "(b)   Be of equal population;
>
> "(c)   Utilize existing geographic or political boundaries;
>
> "(d)   Not divide communities of common interest; and

"(e)    Be connected by transportation links.

"(2)    No district shall be drawn for the purpose of favoring any political party, incumbent legislator or other person.

"(3)    No district shall be drawn for the purpose of diluting the voting strength of any language or ethnic minority group.

"(4)    Two state House of Representative districts shall be wholly included within a single state senatorial district."

Another statute, ORS 188.016, sets out certain procedural requirements for reapportionment:

"(1)    When apportioning the state into congressional or legislative districts, the Legislative Assembly shall hold at least 10 public hearings at locations throughout the state prior to proposing a reapportionment plan.

"(2)    In addition to the hearings required under subsection (1) of this section, the Legislative Assembly or the Secretary of State, whichever is applicable, shall:

"(a)    To the extent practicable, hold five public hearings after a reapportionment plan is proposed, but before the plan is adopted. The adoption of a reapportionment plan may not be delayed by the impracticability of holding one or more of the hearings required under this subsection.

"(b)    Conduct the hearings required under this subsection either in five different congressional districts of this state or with the use of videoconferencing technologies that permit active citizen participation throughout the state.

"(3)    In holding the hearings required under subsections (1) and (2) of this section, the Legislative Assembly or the Secretary of State, whichever is applicable, must:

"(a)    Provide appropriate public notice of the time and location of each hearing;

"(b)    Hold at least one hearing required under subsection (1) of this section in each congressional district of this state;

"(c)    Hold at least one hearing required under subsection (1) of this section and one hearing required under

subsection (2) of this section in areas that have experienced the largest shifts in population since the previous reapportionment, and prioritize holding additional public hearings in these areas; and

"(d) Permit and make provision for individuals at remote sites throughout the state to provide public testimony at the hearings through the use of video equipment."

This court has long recognized that the foregoing constitutional and statutory provisions confer broad discretion on the legislature to devise a reapportionment plan. *See Ater v. Keisling*, 312 Or 207, 213, 819 P2d 296 (1991) (discussing standard with respect to reapportionment by Secretary of State). In reviewing a reapportionment plan enacted by the Legislative Assembly, this court will not substitute its own judgment about the wisdom of the plan. *Id.* With respect to challenges based on ORS 188.010, we will void the Legislative Assembly's plan only if we can say, based on the record, that that body "either did not consider one or more criteria [set out in ORS 188.010] or, having considered them all, made a choice or choices that no reasonable [reapportioning body] would have made." *Hartung v. Bradbury*, 332 Or 570, 587, 33 P3d 972 (2001) (describing standard of review in context of reapportionment made by Secretary of State). The party challenging a reapportionment plan under ORS 188.010 has the burden to show that one of those circumstances—that the Legislative Assembly failed to consider the statutory criteria or made a choice that no reasonable legislature would make—is present. *Id.*

## II.  *SHEEHAN v. LEGISLATIVE ASSEMBLY* (S068991)

Petitioners Patrick Sheehan and Samantha Hazel contend that SB 882 is void in its entirety because it was enacted in violation of ORS 188.010(2) and ORS 188.016. They ask this court to issue an opinion that (1) accepts their contention that SB 882 is unlawful; (2) recognizes "Equitable Map Oregon," a proposed reapportionment map that a member of the public submitted to the Legislative Assembly during that body's reapportionment deliberations, as a reapportionment plan that complies with all applicable laws; and

(3) directs the Secretary of State to adopt "Equitable Map Oregon" in place of SB 882.[2]

## A.   *ORS 188.010(2)—Partisan Purpose*

Petitioners' first argument is that, in enacting SB 882, the Legislative Assembly violated a substantive standard for reapportionments set out at ORS 188.010(2)—that "[n]o district shall be drawn for the purpose of favoring any political party, incumbent legislator, or other person." Insofar as petitioners seek a determination that SB 882 is void in its entirety and have not challenged any one district in particular, they presumably mean to convey that *all* the legislative districts set out in SB 882 were drawn for purposes that ORS 188.010(2) prohibits.

Thus, petitioners insist that a general purpose to favor incumbents can be deduced from the "fact" that the Legislative Assembly "based its map primarily on existing district lines." Petitioners also maintain that a purpose of favoring "the preferences of Oregon's two major political parties" can be inferred from the House and Senate Redistricting Committees' focus on "partisan" maps that the committees had released to the public prior to their hearings and their failure to accept oral testimony about "nonpartisan" maps that were submitted by the members of the public (such as Equitable Map Oregon).[3] Finally, petitioners contend that a general purpose to gain a partisan political advantage for the Legislative Assembly's Democratic majority is evident from the makeup, in terms of the party registrations of their residents, of certain adjacent districts around the state.

---

[2] Under Article IV, section 6(2)(c), of the Oregon Constitution described above, 368 Or at 742, it is this court's task to determine whether and how the Legislative Assembly's reapportionment plan fails to comply, and it is for the Secretary of State, at least in the first instance, to decide on a plan that corrects the identified areas of noncompliance.

[3] In support of those assertions, petitioners refer generally to comments made by the co-chair of the Joint House/Senate Interim Committee on Redistricting at the beginning of each public meeting in which members of the public were invited to testify orally. *See, e.g.*, Video Recording, Senate Interim Committee on Redistricting, SB 882, Sept 8, 2021, at 1:45:00 (comments of Sen Kathleen Taylor), https://olis.oregonlegislature.gov/liz/mediaplayer?clientID=4879615486&eventID=2021091004 (accessed Nov 17, 2021).

Petitioners' arguments are unpersuasive, largely because they rely on debatable and unsubstantiated assumptions about the reasons underlying the Legislative Assembly's actions. For example, although petitioners may be correct that SB 882 uses many of the same district boundaries that are currently in place,[4] that fact does not lead to a necessary or even probable conclusion that SB 882 was drawn for the purpose of protecting incumbents. The fact that the same statutory criteria existed in 2011, when the current district boundaries were adopted, as exist now,[5] and the additional fact that, in many areas, there has been little change in the meantime with respect to those criteria, tends plausibly to explain why many of the lines that divide districts have remained the same.

As to the assertion that the Legislative Assembly betrayed a purpose of favoring one or both major political parties by limiting oral testimony in its redistricting committee hearings to the committees' own "partisan" maps, that assertion does not account for a more likely purpose behind that choice—to efficiently use the limited time that the committees had allotted for oral testimony from the public, by concentrating on the maps that the committees had released for the specific purpose of obtaining the public's response.[6] The Legislative Assembly notably placed no

---

[4] Petitioners' specific assertion is that the Legislative Assembly "based its map primarily on existing district lines." In support of that assertion, petitioners cite a single document in the legislative record, which they identify as the "legislative plan summary." *See* Legislative Plan—House and Senate Districts, House Special Committee on State Legislative Redistricting, SB 882, Sept 20, 2021, https://olis.oregonlegislature.gov/liz/2021S1/Downloads/CommitteeMeetingDocument/249775 (accessed Nov 17, 2021). However, there is no mention of existing district lines in the cited document, much less any suggestion that the Legislative Assembly "based" district boundaries on existing district lines. We assume, therefore, that, when petitioners state that the Legislative Assembly "based its map primarily on existing district lines," they simply mean that the SB 882 map separates legislative districts along many of the same lines that are used in the current district map.

[5] The legislature enacted the statutory requirement that the reapportioning body (the Legislative Assembly or the Secretary of State) consider the criteria now set out in ORS 188.010(1)—that each district be contiguous, of equal population, utilize existing geographic and political boundaries, not divide communities of common interest, and be connected by transportation links—in 1979. Or Laws 1979, ch 667, § 1.

[6] Furthermore, as the Legislative Assembly observes, participants in the public hearings were not *prohibited* from orally testifying about noncommittee maps,

limitations on the public's ability to submit *written* testimony about noncommittee maps, for which such time constraints presumably would not be an issue. And petitioners have made no showing that the Legislative Assembly failed to consider public submissions that were written, rather than oral.

As noted, petitioners also argue that a general purpose of favoring the Democratic Party is evident from the way in which SB 882 distributes Republican and Democratic voters in several adjacent districts around the state. Petitioners point to certain House districts in and around Eugene, Bend, Salem, Oregon City, and Damascus that combine what petitioners vaguely assert are unrelated communities in a way that gives Democrats a narrow voting majority in areas that, as a whole, lean Republican.

This court rejected a similar argument, based on similarly minimal evidence, in *Hartung*. There, we explained:

> "It may be true that, in some circumstances this court could infer from a record that [the reapportioning entity] had the purpose of favoring one particular party over another. However, the mere fact that a particular reapportionment may result in a shift in political control of some legislative districts (assuming that every registered voter votes along party lines)—and that is all that petitioners point to on this record—falls short of demonstrating such a purpose."

332 Or at 599. For the same reason, petitioners' relatively superficial discussion of a few legislative districts in the SB 882 reapportionment map is legally insufficient to establish that those districts—much less the entire map, which is what petitioners challenge—were drawn for an unlawful purpose.

Petitioners have failed to show that the legislature violated ORS 188.010(2) in enacting SB 882.

---

but they were told to "please focus on" the maps that had been released by the committees. *See, e.g.*, Video Recording, Senate Interim Committee on Redistricting, SB 882, Sept 8, 2021, at 1:45:00 (comments of Sen Kathleen Taylor), https:// olis.oregonlegislature.gov/liz/mediaplayer?clientID=4879615486&eventID= 2021091004 (accessed Nov 17, 2021).

B.   *ORS 188.016(1) to (3)—Required Hearings*

The *Sheehan* petitioners also argue that the Legislative Assembly failed to follow certain statutorily required procedures set out in ORS 188.016 when it was considering how to reapportion Oregon's legislative districts. Petitioners note that ORS 188.016(1) requires the Legislative Assembly to hold "public hearings at locations throughout the state prior to proposing a reapportionment plan"; ORS 188.016(3)(b) directs that at least one such hearing shall be held "in each congressional district of this state"; and ORS 188.016(3)(c) directs that at least one such hearing shall be held "in areas that have experienced the largest shifts in population since the previous reapportionment" and "additional public hearings in these areas" must be prioritized. Although petitioners acknowledge that the Legislative Assembly held "remote" public hearings on redistricting, they contend that, because none of those hearings were held in the physical locations dictated by ORS 188.016(3)(b) and (c), they did not fulfill the statutory requirements.[7] Petitioners also contend that the plan was adopted in violation of ORS 188.016(2), which requires that the Legislative Assembly, "to the extent practicable, hold five public hearings after a reapportionment plan is proposed, but before the plan is adopted." Petitioners observe that there were no such public hearings after SB 882 was proposed and that there is no evidence of a finding of impracticability by the legislature.

Although petitioners have asserted that the enactment of SB 882 violated the foregoing requirements, they

---

[7] Although the House and Senate Redistricting Committees originally had scheduled in-person hearings in various communities around the state, the surge in COVID-19 cases in late August 2021 prompted the committee, in consultation with public health experts, to move those hearings to a virtual format. Press Release, Virtual Format for Redistricting Public Hearings Announced Amid Delta Surge, Aug 23, 2021, https://www.oregonlegislature.gov/courtney/Documents/Virtual-Format-for-Redistricting-Hearings-Announced-Amid-Delta-Surge.pdf (accessed Nov 17, 2021). Those hearings were organized in a way that allowed the residents of a given congressional district to sign up to give video or telephone testimony at two virtual hearings that were focused on that district. Thus, although residents of the various congressional districts were not able to meet with the legislative redistricting committees in *physical* locations within their respective districts, they could participate virtually in two redistricting committee hearings that were reserved for residents of their own congressional district. The committees also held two statewide hearings remotely.

have not addressed a provision within SB 882 that exempted the bill from those very requirements. Section 6 of the bill provides:

> "Notwithstanding any other provision of law, ORS 188.016 does not apply to the reapportionment of state legislative districts set forth in sections 1 to 3 of this 2021 special session Act."

By including that section in SB 882, the Legislative Assembly evidently intended to negate any claim that the reapportionment is invalid because it does not comply with ORS 188.016.

Neither is ORS 188.016 made applicable to SB 882 through Article IV, section 6(2)(c), of the Oregon Constitution. Although that constitutional provision speaks of compliance "with subsection (1) of this section *and all law applicable thereto*"—including, presumably, statutory law—ORS 188.016 is not a law that is applicable to the reapportionment set out in SB 882, as stated in section 6 of that enactment.

For the foregoing reasons, we reject petitioners' claims that SB 882 was enacted in violation of ORS 188.016.

C.   *Conclusion*

The *Sheehan* petitioners have not demonstrated that SB 882 violates applicable law in any of the ways they have asserted. It follows that their petition must be dismissed. Or Const, Art IV, § 6(2)(b).

### III.   *CALDERWOOD v. LEGISLATIVE ASSEMBLY* (S068989)

In the second petition for review under consideration in this proceeding, petitioners David Calderwood and Gordon Culbertson challenge the portions of SB 882 that define two adjacent legislative districts in the Eugene area—House Districts 8 and 12. Petitioners contend that those districts are apportioned in violation of the objective criteria set out in ORS 188.010(1), and that they were drawn as they were for an unlawful partisan purpose, in violation of ORS 188.010(2). The Legislative Assembly responds that the challenged boundary line between House Districts 8 and

12 is reasonable and does not reflect a failure to consider the criteria set out in ORS 188.010(1) or show that the districts were drawn for an unlawful purpose. The Legislative Assembly also argues that, to the extent that SB 882 *does* conflict with ORS 188.010(1) and (2), it controls and thereby makes ORS 188.010 inapplicable—because, between the two statutes, SB 882 is the later-enacted statute. We need not resolve the latter issue because, assuming ORS 188.010 is applicable, we conclude that petitioners have not carried their burden to show that the Legislative Assembly acted inconsistently with that statute.

A. *Failure to Consider the Statutory Criteria—ORS 188.010(1)*

Petitioners challenge SB 882 on the ground that it unreasonably places a small portion of southeastern Eugene in the otherwise nonurban House District 12, rather than in House District 8. Petitioners argue that the Legislative Assembly's stated reason for drawing the boundary to include that small part of southeastern Eugene in House District 12—"to reach the population target" for that district[8]—is insufficient, given that the line could have been drawn in a different way that reached the population target of House District 12 while better reflecting the other criteria set out in ORS 188.010(1).

An important component of petitioners' argument is that, although the boundary as drawn by SB 882 may serve the requirement at ORS 188.010(1)(b) that districts "be of equal population," it does *not* satisfy the other ORS 188.010(1) criteria. Thus, petitioners contend that the SB 882 boundary fails to "utilize existing geographic or political boundaries," ORS 188.010(1)(c), when a "readily available boundary"—Interstate 5—could have been used. Neither, petitioners add, does the SB 882 boundary serve the criterion set out in ORS 188.010(1)(e), that each district "be connected by transportation links": Petitioners explain that the small area of southeast Eugene that SB 882 includes in District 12 has strong

---

[8] Legislative Plan—House and Senate Districts, House Special Committee on State Legislative Redistricting, SB 882, Sept 20, 2021, https://olis.oregonlegislature.gov/liz/2021S1/Downloads/CommitteeMeetingDocument/249775 (accessed Nov 17, 2021).

transportation links to other areas of Eugene that were placed in District 8 (including major roads, bus routes, and biking and walking trails), but that no reliable public transportation or major expressways connect that area with the rest of House District 12. Finally, petitioners argue, the SB 882 boundary between House Districts 8 and 12 "divide[s] communities of common interest," in contravention of ORS 188.010(1)(d), in that it separates the small part of southeast Eugene that is petitioners' focus from adjacent areas with which it has obvious common interests—because they are similarly urban and within the same school district and drainage basin.

Petitioners suggest that the unreasonableness of the configuration of House Districts 8 and 12 in SB 882 is evident from the fact that those districts easily could have been drawn in a way that satisfied *all* of the criteria in ORS 188.010(1)—by incorporating all of southeastern Eugene to the west of Interstate 5 into House District 8 and extending the line between House Districts 8 and 12 along Eugene's southern border (thus shifting the southern, more rural portion of House District 8, as drawn in SB 882, to House District 12). That, petitioners argue, would create two districts that reflect "actual communities of interest"—one urban and one rural—each of which would be circumscribed by existing geographical and political boundaries and connected internally by appropriate transportation links.

The Legislative Assembly responds that, at bottom, petitioners' complaint is simply that it weighed the statutory factors in a manner differently than petitioners would have, and that, under this court's reapportionment case laws, that sort of argument cannot prevail. The Legislative Assembly contends that petitioners have failed to show what they must in order to succeed, which is either that the Legislative Assembly did not "consider" the statutory criteria or that, having done so, its conclusions were those that no reasonable legislature would have made. *Hartung*, 332 Or at 587.

The Legislative Assembly explains the chosen boundary between House Districts 8 and 12 by observing that the redistricting committees initially released a draft plan for consideration ("Plan A") that, following a period of public comment, ultimately formed the basis for the enacted

plan. Video Recording, House Special Committee on State Legislative Redistricting, SB 882, Sept 20, 2021, at 1:00:02 (comments of Rep Andrea Salinas), https://olis.oregon-legislature.gov/liz/mediaplayer/?clientID=4879615486& eventID=2021091072 (accessed Nov 17, 2021). One of the features of Plan A was that the portion of Eugene including the University of Oregon campus and surrounding neighborhoods was divided among three different House districts. During the public comment period, the committees received numerous objections to that proposal, reflecting a "desire for the entire university community to be contained within one [H]ouse district as a community of common interest." Legislative Plan—House and Senate Districts, House Special Committee on State Legislative Redistricting, SB 882, Sept 20, 2021, https://olis.oregonlegislature.gov/liz/2021S1/Downloads/CommitteeMeetingDocument/249775 (accessed Nov 17, 2021). In response, Plan A was revised to place the University areas in a single district, House District 8. *Id*. Doing so, however, required making additional changes to House District 8 and neighboring districts to achieve population equality. Accordingly, the revised plan shifted the northernmost part of the Plan A equivalent of District 12 (the University area) to District 8, using East 30th Avenue as the east-west dividing line and retaining Plan A's north-south boundary—the Amazon Parkway—in that vicinity, but then shifting the north-south boundary farther east than it had been under Plan A as that boundary approached Eugene's southern city limit. The revision is illustrated in the maps below:



Plan A Map                          SB 882 Map

What that history of the plan shows, the Legislative Assembly maintains, is that the challenged districts evolved from an earlier proposal for the area and ultimately were drawn as they were in recognition of a strong public sense that the University area of Eugene is a community of common interest that should be located in a single district and to ensure equal populations between districts. The Legislative Assembly also contends that the choice to divide House Districts 8 and 12 along East 30th Avenue and leave the rural areas southwest of Eugene in House District 8 is reasonable: East 30th Avenue marks the boundary between two Eugene neighborhoods, as defined by the Eugene Neighborhood Association, and the District 8 boundaries serve to keep the southwestern part of the catchment area for Eugene schools in the same district as parts of Eugene.[9]

The Legislative Assembly also provided historical information concerning legislative districts in the area of House Districts 8 and 12, which the *Calderwood* petitioners do not dispute. That information shows that, historically, much of southeast Eugene has been combined with parts of rural Lane County in a single district and that the proposed plan that the Legislative Assembly used as its starting point for reapportionment (Plan A) also combined much of southeast Eugene in a single district with part of rural Lane County. In other words, there is precedent for including the portion of southeast Eugene that is the subject of petitioners' challenge with more rural areas outside the Eugene city limits. It is true that SB 882 separates that portion of southeast Eugene from other parts of southeast Eugene in a way that previous districting plans did not, but the Legislative Assembly attributes that development to the evolution of Plan A in response to the public concerns about the University area. Moreover, as noted, the Legislative Assembly explains that the line of demarcation that SB 882 draws between those areas of southeast Eugene is rational in that it follows a geographic boundary of recognized significance, East 30th Avenue.

---

[9] The Legislative Assembly also notes that the Eugene School District boundary is used as part of the House district boundary. *See* Legislative Plan—House and Senate Districts, House Special Committee on State Legislative Redistricting, SB 882, Sept 20, 2021, https://olis.oregonlegislature.gov/liz/2021S1/Downloads/CommitteeMeetingDocument/249775 (accessed Nov 17, 2021).

Having considered the parties' evidence and arguments, we conclude that petitioners have not shown what they must to prevail on this issue—either that, in drawing House Districts 8 and 12, the Legislative Assembly did not consider the statutory criteria set out in ORS 188.010(1) or that, having done so, it made decisions about the districts that no reasonable legislature would have made. First, although petitioners assert that the legislature considered only the need for population equality, the record does not reflect that. Although the Legislative Assembly noted that particular requirement in explaining why certain adjustments were made to Plan A, that hardly means that it did not "consider" the other statutory criteria. Indeed, the record suggests the opposite—that the Legislative Assembly did "consider" all the required factors in designing those districts, even if it did not optimize all the factors in every decision.[10] *See, e.g.*, Legislative Plan—House and Senate Districts, House Special Committee on State Legislative Redistricting, SB 882, Sept 20, 2021 (listing, for House Districts 8 and 12, the transportation links within the district, showing that various school district lines were used as boundaries for House District 8 and that county lines were primarily used as boundaries for House District 12, and stating that an earlier District 8 plan was altered in response to concerns about dividing a community of common interest—the University area) https://olis.oregonlegislature.gov/liz/2021S1/Downloads/CommitteeMeetingDocument/249775 (accessed Nov 17, 2021); *see also* Video Recording, House Special Committee on State Legislative Redistricting, SB 882, Sept 20, 2021, at 1:01:00 (statement of Rep Andrea Salinas, indicating that redistricting committees had heard community-of-common-interest concerns from small and rural communities in south and east Lane County, *i.e.*, the area that became SB 882 House District 12, "and we honored that"), Video Recording, House Special Committee on State Legislative Redistricting, SB 882, Sept 20, 2021, at 1:00:02 (comments of Rep Andrea Salinas), https://olis.oregonlegislature.gov/liz/mediaplayer/?clientID=4879615486&eventID=2021091072 (accessed Nov 17, 2021).

---

[10] On that point, it bears mentioning that ORS 188.010(1) requires the Legislative Assembly to consider the listed criteria for "each district"—not to justify every decision about a district's boundaries in terms of the criteria.

Neither can we say, from the record before us, that the Legislative Assembly's decisions with respect to the identified districts, and particularly its decision to place most, but not all, of southeast Eugene in House District 8, were ones that no reasonable legislature would have made. Thus, we do not agree with petitioners that any reasonable legislature, having decided to place the University area in House District 8, would have used Interstate 5 as the boundary with House District 12. Petitioners suggest that using Interstate 5 would satisfy the criteria at ORS 188.010(1)(c)—that, as nearly as practicable, each district shall "utilize existing geographic or political boundaries"—while using East 30th Avenue does not. But they have not explained why all reasonable lawmakers would have had to view Interstate 5 as a superior boundary; Interstate 5 has no independent political significance and, as the Legislative Assembly points out, it does not feature prominently as a district line in most of the rest of the plan enacted by SB 882. Neither do we agree with petitioners that any reasonable legislature would have excluded the rural areas southwest of Eugene from House District 8 because those areas have nothing in common with the part of the district that is within the city limits. We think the Legislative Assembly could reasonably consider the Eugene School District catchment area as an area of commonality and take that into consideration in drawing the district lines (as it suggests it did).[11]

In the end, the most that petitioners' arguments have demonstrated is that other possible configurations of the two districts might have been preferable to some observers. But that is not the standard by which this court

---

[11] Petitioners contend that the Legislative Assembly's discussion of the Eugene School District catchment area is a "post-hoc rationalization [that] cannot explain the District 8/12 line"—because SB 882 splits the Eugene School District into at least four separate House districts. But that contention misses the point. The Legislative Assembly does not suggest that its decision to place the boundary where it is was driven by a desire to keep the entire Eugene School District together in one district, but simply notes that it was reasonable to keep the portion of the school district in the rural area southwest of Eugene together with the city. That point is merely in addition to its primary explanation of the district's boundaries—that they resulted from adjustments to the plan that the Legislative Assembly had used as its starting point, made to equalize district populations after acceding to public comments in support of keeping the University area in a single district.

evaluates a challenge under ORS 188.010. Particularly when considered in light of the history that the Legislative Assembly has provided, we cannot say that the decision was unreasonable. Accordingly, we reject petitioners' challenge to the two districts under ORS 188.010(1).

B.  *Purpose of Favoring an Incumbent—ORS 188.010(2)*

Petitioners also challenge the parts of SB 882 that define House Districts 8 and 12 on the ground that they were drawn for the impermissible purpose of protecting an incumbent. In particular, petitioners contend that the boundary between the two districts was drawn to exclude Representative Marty Wilde's home from Senate District 4, so that Representative Wilde could not mount a primary challenge to Senator Floyd Prozanski.[12] In so arguing, petitioners point to the fact that Representative Wilde lives within the small area of southeast Eugene that, under SB 882, is combined with more rural areas in east Lane County to make up House District 12. Petitioners contend that, if legislators had drafted the map in the manner that petitioners say was required, Wilde's home would have been within House District 8, which is part of Senate District 4.

Petitioners attribute the chosen boundary in SB 882 to a desire to protect Senator Prozanski from a potential primary challenge by Representative Wilde. In support of that theory, they rely on a declaration from Representative Wilde, in which he avers that (1) at some unspecified time, he had expressed to Senator Prozanski and Senator Lee Beyer that he is interested in running for the Senate; (2) under Plan A, the House district in which Wilde's home is located and the House district in which Senator Prozanski's home was located would have been in the same Senate district; (3) Wilde objected to Plan A, insofar as it divided the University area of Eugene among three House districts; (4) Wilde organized constituents and other supporters to object, in hearings and in writing, to Plan A; (5) he had disclosed his role in that campaign against Plan A to the Chair of the House Redistricting Committee; (6) once the redistricting committee decided to keep the University

---

[12] Senator Prozanski represents current Senate District 4 and lives in an area which also is assigned to Senate District 4 under SB 882.

area in a single district, all subsequent reapportionment maps, including the one that ultimately was enacted as SB 882, placed Lane County Precinct 1233, where his home is located, in House District 12; and (7) "when [he] objected to * * * including Precinct 1233 in House District 12[], [he] was told by Democratic leadership that the request to place [P]recinct 1233 in [H]ouse District 12[] came from Senate leadership, and that they were inflexible on this matter."

Aside from those factual assertions, Representative Wilde's declaration also presents a theory:

> "The only logical inference from the facts that (1) SB 882 removed my home precinct from House District 8[] (and therefore Senate District 4[]) with near-surgical precision, (2) that decision came from the Senate leadership in particular, and (3) Senate leadership knew I intended to run in the upcoming Senate primary election, is that the Senate leadership wanted to protect Senator Prozanski from my primary challenge."

That "logical inference" is the essence of petitioners' contention that House Districts 8 and 12 were drawn for the purpose of favoring an incumbent legislator, in violation of ORS 188.010(2).

The Legislative Assembly objects to petitioners' argument on three grounds: (1) that the Wilde declaration contains insufficient evidence to permit a conclusion that House Districts 8 and 12 were drawn for an unlawful purpose; (2) that the Wilde declaration cannot be considered as probative of legislative intent because it was prepared after the enactment of SB 882, for purposes of litigation; and (3) that the Wilde declaration is inadmissible under the Debate Clause of Article IV, section 9, of the Oregon Constitution,[13] because it makes assertions about what other legislators said regarding legislative work and, thus, would require those legislators to waive their legislative privilege in order to refute Wilde's assertions.

Because we agree with the Legislative Assembly's first argument, we need not consider the other two. That is,

---

[13] Article IV, section 9, of the Oregon Constitution provides, in part, "Nor shall a member [of the Legislative Assembly] for words uttered in debate in either house, be questioned in any other place."

even assuming—without deciding—that the Wilde declaration can be properly considered despite Article IV, section 9, and that it could be probative of legislative intent despite its timing, it falls short of allowing the inference that petitioners say it compels.

Several points bear emphasis. Under Plan A, Representative Wilde's home would have been in the same Senate district as that of Senator Prozanski, but Representative Wilde helped lead the *opposition* to that plan based on its fragmentation of the University area. The suggestion that legislators had a single-minded desire throughout the process to place the homes of Representative Wilde and Senator Prozanski in separate Senate districts is difficult to square with the design of Plan A in the first place. Moreover, although the declaration asserts that, after the boundaries were revised, "Senate leadership" declined to consider Wilde's suggestions for further revising them, that assertion is not strongly probative of the *initial* purpose for the revisions. Rather, that assertion is at least as consistent with the possibility that legislators, having already made substantial changes to House District 8 in response to public concerns, and acting within significant time constraints, were disinclined to make further changes based on the particularized concerns of Representative Wilde. And, finally, Wilde's assertion that his home precinct was "removed" from House District 8 with "near-surgical precision" is somewhat at odds with the evidence regarding the evolution of the plan. Another way to understand what occurred is that Wilde's home precinct was simply left behind in the area that became House District 12 when areas around it were shifted to House District 8 along a line whose proximity to Wilde's home does not seem remarkable, given that its purpose was to exclude the University community, to the north of Wilde's residence, from the district.

Particularly when considered in the light of those points, the inference that petitioners draw from the factual assertions in Wilde's declaration—that is, "when Wilde told two senators about his general interest in running for the Senate, the entire legislature viewed his candidacy as such a significant threat to the incumbency of a senator living in a different district that they reacted by moving the

challenged boundary where they did"—is a weak one. And when considered in the light of the other facts discussed in this opinion, including the evolution of the legislature's plans for the University area of Eugene, it is clear that there were logical reasons for drawing the boundary between House Districts 8 and 12 in the manner that SB 882 did. We therefore reject petitioners' assertion that, in drawing the boundary between House Districts 8 and 12 in SB 882, the Legislative Assembly violated ORS 188.010(2).

## C. *Conclusion*

The *Calderwood* petitioners have failed to demonstrate that the parts of SB 882 that define House Districts 8 and 12 do not comply with applicable law in any of the ways they have asserted. It follows that their petition must be dismissed. Or Const, Art IV, § 2(b).

The petitions are dismissed.